Warner, J. (orally).
In this case the plaintiff has sued for divorce and alimony, alleging as grounds extreme cruelty and gross neglect of duty.
She alleges in her petition a common law marriage on the 17th day of January, 1906, and cohabitation thereafter for somewhat over three years.
As substantiating the grounds for divorce and alimony she alleges desertion on the part of the defendant, Louis Drach, when at one time she asked 'him to refund to her certain monies which she alleged she had given to him. She also alleges a conspiracy between her husband and a man by the name of Reilley, I think, by which she was sent to California and left there without means; that' she has been arrested without warrant and without right at the instigation of her husband, and certain other allegations are made which, if shown to be true, would doubtless constitute gross neglect of duty.
*354 The first question raised in this case relates to the matter of common law marriages in this state, and it is claimed that possibly there is some doubt as to whether a common law marriage is valid in Ohio.
I shall not take any time to discuss that question, for I am satisfied from the decisions of the Supreme Court of Ohio in two cases, the Carmichael case in the 12th O. S., and the Duncan case in the 10th O. S., that common law marriages in Ohio are recognized by the law of this state.
As the common law is the foundation of the law of the state of Ohio, it follows that until the Legislature in its wisdom declares against the validity of common law marriages that they must, when proven, be enforced by the courts of the state.
The serious question that has been presented in this case arises upon the contention that no common law marriage is shown by the evidence as presented to the court.
There are two ways in which a common law marriage may be shown. One is specified in the statute on divorce and alimony in this state wherein it is enacted that proof of cohabitation and reputation may be given, and may be sufficient in the opinion of the court to establish marriage and justify subsequent divorce. This is, perhaps, the usual way in which common law marriages are determined to exist.
It will be observed that where the proof relates to cohabitation and reputation that evidence is not introduced of the original contract, but the original contract is assumed and presumed to exist from the fact- of cohabitation and reputation, and this kind of evidence being purely presumptive may be rebutted by other evidence, and when this occurs it becomes the duty of the court under such circumstances to determine whether or not under all the evidence a common law marriage should be presumed to exist in the case. ' ■
The other mode of showing the existence of a common law marriage is to prove the contract by direct evidence thereof, and when the contract is proven, clearly and decidedly, no evidence under the common law is required as to subsequent cohabitation or reputation to establish such contract.
*355 Bouvier defines a common law marriage as follows:
“At common law no particular form of words or ceremony was necessary. Mutual assent to the relation of husband and wife was sufficient. Any words importing a present assent to being married to each other were sufficient evidence of the contract. ’ ’
And Mr. Kent in his Commentaries says:
“If the contract be made per verba de presentí, and remains without cohabitation, it amounts to a valid marriage.”
And Chief Justice Folger of the New York Court of Appeals in 1880 held:
“A man and a woman who are competent to marry each other —without going before a minister or a magistrate, without the presence of any person or a witness, with no previous public notice given, with no form of ceremony, civil or religious, and with no record or written evidence of the act kept, and merely by words of present contract between them—may take upon themselves the relation of husband and wife and be bound to themselves, and the state, and society. ’ ’
These eminent authorities establish beyond a doubt what the common law of the United States is as to marriage.
No doubt has been thrown upon these definitions by any decision in the state of Ohio except, perhaps, the case of Carmichael v. State, in the 12th O. S.; brut that was a criminal case in which the party being charged with bigamy was1 on trial, and remembering the well known rules of evidence and law applicable to criminal cases, it is at least doubtful whether the same rule would apply in cases of this kind.
In that case the only doubt thrown upon the definitions quoted was the statement of the court that publicity and reputation were material in showing the intent of the parties to establish the relation of husband and wife, and as in criminal cases the intent is always a matter -to be determined the court well may have said what it did say in regard to that point without intending any conflict with said authorities.
But in that ease there was actual publicity followed by long cohabitation. The party who was indicted' was found guilty *356 of bigamy upon evidence that a common law marriage had taken place first and that a statutory marriage had taken place after-wards during the life of the wife by the first marriage.
Some doubt may perhaps have been thrown upon the ques-tion as to the necessity of cohabitation and reputation by the Bates ease in one of our circuit counts, but it is not sufficient to have overturned the common law rule so well established in this country. It is a mere' doubt at best, and until the Legislature of the state speaks the rule.as quoted can not be considered as abrogated.
I speak of this simply for the purpose of clearing away some of the confusion that has crept into the reports by a failure to observe the clear distinction between proof of the contract by direct evidence thereof, and presumptive proof of the contract by the acts of the parties thereafter.
Marriage under the common law is a civil contract, and is subject of course to the usual rules which apply to contracts between parties—strictly construed in the case of marriage, which is regarded as a more important and sacred contract than others.
Now coming.to the facts in this case, was there a common law marriage within the definitions which I have given and within the purview of the law as it has been administered in the state of Ohio?
The defendant, Drach, had known the plaintiff for some time prior to this alleged marriage. He had followed her to California where she had gone attending to the turf matters in which she was interested, her race horses and matters connected therewith, and after he reached California he put up at the same hotel as the plaintiff and shortly thereafter proposed marriage. He did this more than once. He urged the plaintiff to marry him, and the fact that he repeated the requests gives point to the statement of the plaintiff that she at first refused. She says that he said that he would commit suicide, and in that way publish her to the world if she did not marry him. He denies the suicide threat but admits that he did several times ask her to marry him. There is no dispute about this. Finally it appears that she consented to marry him, and there is no dispute *357 about that fact. After this he proposed the contract system of consummating the marriage, and the testimony shows very clearly that the matter was talked over and finally agreed by the parties that they would become then husband -and wife. She says it was so agreed; he does not dispute it, and then this writing which was offered in evidence was prepared by him and executed and given to her. This is the paper:
“Los Angeles, California, January the 17th, 1906. I hereby proclaim Lora Mustain as my wife, having lived with her as such at No. 10161/2 Olive street, Los Angeles, Cal., and it is my desire that she shall inherit all my estate. Signed, Lo ais Drach. ’ ’
The question presented is whether this evidence establishes a common law marriage. I am clearly of the opinion that it does. In fact to hold otherwise would be to annul the testimony of the parties and to annul this written statement signed by Louis Drach.
It is perfectly clear and perfectly conclusive under the evidence that such a marriage took place, the common law requirements all being present, and it does not lie in the mouth of the defendant to say, after having signed this paper in which he proclaims this plaintiff to be his wife, that she is not his wife.
I think, therefore, under this evidence that the contract of marriage has been amply shown, and that in fact there is not in this case a syllable of evidence to the contrary, absolutely not a syllable of evidence to the contrary. The contract is clear enough and the proof is absolutely clear and apparent on that subject.
Now if it needed cohabitation and reputation and publicity to give point to this marriage and to make it valid, that exists in this ease. They lived together as husband and wife at Olive street for nearly a month. They then went to San Francisco for a day or two, and .then to Omaha .and to Chicago and I believe- then to Cincinnati, all the time associating together as husband and wife would naturally associate under the circumstances.
But it is claimed on the part of the defense that at Omaha a transaction took place that vitiated anything that had taken place in California, and that what did fake place at Omaha shows *358 clearly that there was no marriage in California. I do not so construe the evidence. There is no way under the law after a common law contract has been consummated to abrogate it, except by divorce, and it is utterly immaterial what the parties otherwise do afterwards so far as abrogating the contract is concerned. It is a marriage and it stands until-death or divorce separates the parties.
Bu-t at Omaha it appears that he suggested that they be married in the regular statutory way, obtain a license and go before a justice of the peace and be married. He attempted to do that. But the license clerk was off'on a “toot” of some sort and the license could not be obtained and the matter was dropped. All that this shows is that the defendant, Mr. Louis Drach, might have had some doubt in his own mind as to the validity of the marriage in California.
When they got to Cincinnati, there is a conflict of testimony as to what occurred. I am inclined to believe from the evidence that they lived together in Cincinnati, as husband and wife and under the name of Drach, in at least two places and in other places under other names- at his request and instance, and that the intermittent character of their life in Cincinnati resulted from her interest in certain race horses and her absence from the city at times attending to these interests, and also from the other fact that Mr. Drach did not care to have it known that he had married this plaintiff; and I can see very clear reasons why he should desire to conceal the fact of his marriage. I hardly need to refer to them, for they are apparent from the evidence. The fact that this plaintiff had lived in Cincinnati previously, and he had known her reputation and habits, that she was connected with the race course, and was passing under, and had passed under, the name of Jones, the name of her manager of race horses, and the fact that if those things were known it would affect his business relations in the Drach Construction Company and among his relatives, was a sufficient reason why he should askj as she says he did ask, that the marriage should be concealed.
Now if I were to determine the validity of the marriage upon the circumstances attending their cohabitation and association *359 in Cincinnati alone, without explanation, I should have no doubt and should immediately hold that the association was meretricious, but we are not concerned with that at this time in this case. The marriage contract has been proved, the common law marriage has been shown, and sufficient facts have been adduced to indicate that the association in Cincinnati was- at his instance and not at hers, and that she but conformed to his wishes and his requests in the matter.
So far as the association with Mr. Jones is concerned, that association existed some two years before the marriage in .this ease, and if it be true and I think it is true from the statement of the plaintiff herself that she lived with him at Hot Springs some six or seven weeks, it was doubtless a meretricious alliance and not a marriage. There is no evidence that they were husband and wife. She declares- that they were not husband and wife and there is no other evidence upon the subject, and under such circumstances it would be impossible for a .court to hold that there was a marriage between her and Mr. Jones. The evidence would not be sufficient under the rule well established in this state to raise even a presumption of marriage.
There are other features in this case that have been presented, to which I need not refer in making this decision.
The decree of the court, so far as this branch of the case is concerned, will be that the plaintiff is entitled to a divorce from the defendant upon the ground of gross neglect of duty. The fact that the defendant in this case in addition to the other facts of desertion and prosecution shown, declaring that she was not his wife and alleging that she was his mistress, is one of the things that the court can not pass over in deciding to grant a divorce.
It does not appear in this case that the defendant has -any particular property. The evidence shows that so far as the Drach Construction Company is concerned, his brother put in the entire capital stock and that, at the time he put it in, the certificates of stock with the exception of four shares were issued to Louis Drach and then pledged to his brother as security for the $10,000 that he had put in, and afterwards, in 1908, 950 of those shares were transferred back to Mr. Gustave Drach, *360 leaving 35 shares of $10 each, amounting to $350 face value, in the name of Mr. Louis Drach, the defendant, and there is no other showing of any other property that he possesses. It it manifest therefore that his interest in the concern, his real interest in the concern, is limited to 35 shares.
I think it is manifest too from the evidence that the Drach Construction Company is doing considerable work and is making considerable money, and that he ought to receive out of it some amounts as dividends upon the work done. The amount of his salary as president of the company seems to be in dispute. It is either $20 a week or $25 a week. The earning capacity however of the defendant I think can justly be held to be at least $100 a month. I think it is more than that, but it certainly is at least that, and following the usual rule that is adopted I will allow the plaintiff $35 per month alimony, payable monthly, and in addition to that amount the sum of $500 gross alimony, to cover her expenses in this case.